I will hear Deutsche Bank Securities against Roscoe's. Good morning, Your Honors. My name is Scott Hessel. I represent the appellants in this case, the cards investors who are seeking a reversal of the trial court's order in joining arbitration from going forward against the seven FINRA registered broker-dealers, as well as Deutsche Bank Securities and Deutsche Bank Alex Brown. As I'm sure this court is aware, the principal issue that is before Your Honors and was before the trial court is whether my clients were customers of the registered broker-dealers in the context of their cards transactions. This case, like many that have come before this court, arises out of Deutsche Bank's involvement in and participation in illegal tax shelters. Though in the past, Deutsche Bank has actually come to this court seeking to compel tax shelter clients to arbitration, here they argue that notwithstanding that it was undisputed that the broker-dealers executed and supervised the execution of securities transactions on behalf of my clients, those brokers were, at the time they did so, wearing their private bank hat. And private bank is not a FINRA-registered entity, but the broker-dealers were employees of both private bank and DBSI, Deutsche Bank Securities, Inc. And the— I don't think that was the problem, Frank. I thought the problem was that your client was a customer of DBAG abroad. Well, there's no question that part of a card's transaction involved lending, financing by Deutsche Bank AG. Well, that's who your client's relationship was with, right? It was with DBAG. Well, I guess that's something of a loaded term. There was a DBAG credit agreement, but that was not the extent of the relationship between the parties— Well, there was two fees that were paid in connection with the transaction. One fee was a lending fee that was paid to Deutsche Bank AG, in addition to which there were fees that were paid as custodial fees, structuring fees, and assorted other fees that were paid through private bank. To whom did your client write checks or make wire transfers or hand over big piles of cash? Right. And, Your Honor, the answer to that question is both Deutsche Bank AG as well as Deutsche Bank Private Bank, a private bank entity. The question— Is private bank a—is not one of the defendants you're trying to get respondents in your arbitration claim? That's true. So, again, what makes your client a customer of the entities or individuals who you are trying to compel to arbitrate? Right. And the answer to that question is the people with whom they purchased the securities, which were forex trading instruments as well as promissory notes that were denominated in foreign currencies. Deutsche Bank, it's— How does that make your client a customer—let me try it a different angle. How is this case different than a bar? Yeah. That's the key question. Right. There are really two issues, I think, on which to distinguish this case from a bar and to also answer your question, which is, does the fact that we paid fees to Deutsche Bank Private Bank change the fact that registered broker-dealers sold our client's securities? The fact that they directed the payments to be made to private bank and then received revenue recognition on the FINRA registered broker's bonus sheets is not dispositive. As a bar even recognized, you can purchase securities from broker-dealers indirectly. And in a bar, it's at footnote 5, it cites to FINRA regulatory notice that in the context of suitability rules, it defines a customer as one who pays for services either directly or indirectly. Here, Deutsche Bank directed that the payments be made indirectly. My clients didn't pick and choose with whom—which of the various Deutsche Bank entities were involved in the transactions. They were sold a turnkey price, essentially. The— Who transferred the securities to your client? Right. And there is the second basis to distinguish from a bar. In a bar, this court found it dispositive and affirmed the trial court's ruling that the broker— I'm sorry. I had a question. Oh, sorry. Which was, who transferred securities to your client? Broker-dealers. The broker— Your client gets the securities. Right. And they come from where? They come— From the Deutsche Bank registered brokers. The Westhoffs, et cetera. There's a letter of authorization that's in the record, which you'll find at Appendix 458 and 460, a letter of authorization from our clients to Mr. Westhoff, who was the registered broker-dealer, confirming the execution of a foreign exchange spot at certain prices on certain specified dates. Mr. Westhoff happens to be both employed by private bank as well as a registered—a DBSI registered broker-dealer. The question that, from my perspective, is who's—on whose behalf— Who owned the securities before they wind up with your client? Well, they're not—Forex trades are not like a stock of Apple. They're a position, a trading position, which is essentially at a certain price, executed on a certain date. It was for our client's benefit. There's no question about that. But Barr says this is supposed to be simple. A customer is someone that either pays money to you or gets something back from you, right? Well, respectfully, respectfully, Your Honor, what a Barr was—and what I was getting at was, in a Barr, the appellate—this court affirmed, the trial court's finding, that the brokers, the City, New York employees who were working on the transaction were working on behalf of City, UK. That is a finding of fact which this court affirmed. Here, the trial court and Deutsche Bank do not dispute that the FINRA registered broker-dealers were acting not on behalf of Deutsche Bank AG, but on behalf of the defendants in this case. That's at page 4 of the opinion, and it's derived out of an admission on the 56-1 statement of facts. The trades were executed on behalf of our clients. They were not executed on behalf of Deutsche Bank AG. So the only question is— These are the credit agreements that have been set up, right? I mean, it was part of the overall package that had been sold to your clients. Credit agreements and also custodial fees and other fees. All with the aim of facilitating this tax shelter scheme, right? Absolutely right. And the reason why— You bought a tax shelter scheme from DBAG, and then various people in New York operate to make that happen, which looks to me exactly like a bar. But in a bar, the question was, on whose behalf were those city New York employees acting? It wasn't—it was that the relationship existed solely with CityUK. But here, there are letters of instruction from our clients— In a bar, the plaintiff actually met with, negotiated with, gave instructions to the people in New York. Nothing like that is true here. Yeah, in here, a letter of instruction directing purchase of a trade confirmation is made by our clients to the broker-dealers. And it's not an accident that broker-dealers are involved in this transaction. Deutsche Bank itself has taken the position in CARDS cases that these CARDS transactions, quote, involve the purchase and sale of securities. If broker-dealers are not involved in the CARDS transactions, it's illegal under 15 U.S.C. 780, because only a registered broker-dealer can involve the purchase and sale of securities. The fact that there were trade— If it's all illegal, the whole business is a tax scam. Well, that's a fair point, but— On both sides, including your clients. Well, I respectfully disagree. There were obviously legal opinions and accountants who backed it. But the point remains that there were broker-dealers, lots of them, involved in these execution of trades. They received transaction-based compensation. That's what makes it different by a bar. That's also true in a bar. In a bar, they were acting on behalf of Citi UK, not on behalf of the clients. There was an allegation that they received transaction-based bonuses for playing a role in this. With all due respect, they were not fees in the traditional sense of purchasing a security, like they were here. They were bonuses derived out of the profits that Citi UK might make on the transaction. That's not what we have here. Thank you, Mr. Henshaw. You've reserved two minutes. May it please the Court, Allen Taft on behalf of the appellees. The appellants here are a group of unrelated participants in a tax shelter strategy known by the acronym C.A.R.D.S., and as we have heard, they each received bank loans from the non-FINRA member, DBAG, and those are reflected in the written agreements, the credit agreement, master-pledge agreements, assumption agreements, these commercial transactions reflected in detailed written agreements. They were entered through special-purpose entities. In return for issuing millions of dollars in loans, DBAG received loan fees and interest on the loan. And maybe I should just skip ahead to a bar. The Court labored there. If you recall, Judge Stanton, District Judge Stanton, had a nine-day bench trial and then threw up his hands after the trial and said, why did I do this? It went up to the Court, and the effort was to come up with a bright-line rule. We're talking here about a customer. You purchase goods or services. Shouldn't be that hard to follow. In a bar, the relationship was between a bar and Citi UK, pursuant to written, structured servicing letters involving these complex option transactions. But in a bar, the FINRA member, Citi New York, helped structure and manage the options transactions, had final say over investment decisions. There were more than 30 FINRA brokers at Citi New York working on a bar. As Your Honor noted, they were interacting extensively with the bar. This is a line from the bar decision. Citi New York employees certainly provided services to a bar. They helped structure and manage the options transaction. And as noted, one Citi New York employee received $900,000 in bonuses largely for his role in structuring the options transaction, so the money flowed down from Citi UK. That did not transform the relationship into a customer relationship on a FINRA level. It's not a mystery here. It's reflected in the clear documents. And there were other entities that the appellants don't discuss that had a role in cards. You have Chenery and MyCFO. These are entities providing investment banking and analytical services. You have two international law firms providing more likely than not tax opinions. All these entities are getting paid. DBAG got paid to make the loan because the loan was in euros in a foreign denomination and was converted into dollars and that was the taxable event from which alleged tax losses flowed. There were foreign currency swap transactions, euros into dollars. Those are the transactions that occurred. In any event, it's not clear that any FINRA license was required to execute those transactions. They were overseas transactions. But that's the nature of the transaction because the loan was in euros and was converted into dollars. At bottom, the appellants here are asking this court to revisit and overturn a bar's bright line rule and we would respectfully ask that the court follow this court, had no problem applying a bar and we would ask this court to adhere to a bar. And unless there are further questions, we'd rest on our papers. All right, we'll hear from Mr. Hessel, who's reserved two minutes. The finding in a bar on which this court found to be central to the dismissal was the following. The district court found as fact that when City New York provided management services to a bar, it acted primarily for City UK in connection with the services City UK was providing to a bar. The finding of fact is not clear error, and it is well supported by the record. In contrast, the trial court went on to say that, of course, services were provided to a bar. In the course of this, the entire Citibank world was providing services to a bar, including the entities in New York. But the relationship of the bar was with the foreign entity. And what the court, to say all that happened in a bar is that this court affirmed the fact finding after the lengthy bench trial is totally to misread a bar. What the opinion is about is to say Judge Stanton was right at the end when he said I didn't have to do all this because it's simpler than that. Right, and the issue from my perspective about what distinguishes a bar from this transaction is the fact that in a bar, City had a substantial position, City UK, had a substantial profit position that they created. They used all of the employees of City, including City New York employees, to make that transaction happen. In contrast to which, here, there is only one customer. There is only one party on whose behalf the people who are involved in this transaction are acting. It is our clients. And the fact that broker dealers provided standard brokerage services to, on behalf of our clients, which is what the trial court found, not to our clients, but on our clients' behalf. Those brokers required express letters of authorization by our clients to them to make those trades is what makes it different. It's not acting on behalf of Deutsche Bank AG who has this agreement with our clients to provide services to them. It's executing trades on behalf of our clients. The fact that we don't pay them a fee directly shouldn't change that there's still a purchase of services. Thanks very much. Respectfully. Reserved decision. Thank you both very much for coherent arguments. Thank you.